# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 14, 2023

Lyle W. Cayce
Clerk

No. 22-20659

UNITED STATES OF AMERICA, *ex rel*, KENT VAUGHN,

*Plaintiff—Appellant*,

*versus*

HARRIS COUNTY HOSPITAL DISTRICT, *doing business as* HARRIS HEALTH SYSTEM; HARRIS COUNTY CLINICAL SERVICES, INCORPORATED; MEMORIAL HERMANN HEALTH SYSTEM; CHRISTUS HEALTH; CHRISTUS HEALTH GULF COAST; HCA HEALTHCARE; HCA GULF COAST DIVISION INCORPORATED; ST. JOSEPH MEDICAL CENTER; HOUSTON METHODIST; TEXAS CHILDREN'S HOSPITAL; ST. LUKE'S EPISCOPAL HEALTH SYSTEM; AFFILIATED MEDICAL SERVICES; BAYLOR COLLEGE OF MEDICINE; UT PHYSICIANS,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-2749

Before GRAVES, HIGGINSON, and HO, *Circuit Judges*.

JAMES E. GRAVES JR., *Circuit Judge*:[*]

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-20659

Appellant Kent Vaughn brought a False Claims Act suit against Harris County, and other hospital and medical Defendants, alleging fraud against the government. Because the District Court found that Vaughn's second amended complaint was substantially the same as publicly disclosed allegations, it dismissed the suit. We AFFIRM.

## Background

This appeal stems from Appellant Kent Vaughn's False Claims Act ("FCA") suit against the Appellees concerning Medicaid fraud. The Medicaid program is a cost-sharing program between the federal government and state/local governments, where the federal government pays at least 50% of the cost of each state's Medicaid program. 42 U.S.C. § 1396d(b). States may offer additional supplemental Medicaid payments up to a federally established "Upper Payment Limit" ("UPL"), which is meant to get the reimbursement rates closer to the actual cost of providing care. Thus, the funding for the Medicaid program includes Medicaid reimbursements and supplemental payments. Some states, such as Texas, get funding from local governments to help with the state's portion of Medicaid payments ("intergovernmental transfers"). In 1991, in order to stop state and local governments from shifting their contribution responsibilities to the private sector, Congress amended the Medicaid statute to exclude "non-bona fide provider-related donations" ("NBFD Statute") from federal matching. 42 U.S.C. § 1396b(w)(1).

Here, Vaughn alleges that in 2008, the Appellees "engineered a scheme" to violate the NBFD Statute by collecting payments deemed to be "donations," from private hospitals and submitting that payment as being entitled to Medicaid reimbursement in order to receive federal matching funds from the Government. This scheme, referred to as the Collaborative Program (the "Collaborative"), involved private hospitals paying as

"donations," inflated medical staffing costs and expenses provided by medical schools at and for Harris County Hospital District ("HCHD") hospitals. HCHD then used these "donations" as cost savings and increased the amount of funds to the State of Texas through intergovernmental transfers, to fund the state/local government share of the Medicaid program. The federal government would then accordingly match the amounts Texas received from HCHD, and the increased funds were made available for UPL payments to the private hospitals involved in the Collaborative. Vaughn alleges that all of the non-federal parties involved in the Collaborative benefitted because "the private-hospital Defendants knew they would receive back in Medicaid payments substantially more than they 'donated' to cover HCHD's medical-staffing costs . . . the medical-school Defendants increased the amount they charged HCHD so that they received exorbitant payments . . . for their medical-staffing services [and] . . . HCHD's hospitals saved the cost of medical staffing services, appeased the [medical school Defendants' demands for higher pay], and were able to make increased intergovernmental transfers." Vaughn alleges that this scheme was in violation of the NBFD Statute because the state and local governments did not cost-share with the federal government as the Medicaid program required, but shifted the financial burden to private hospitals who later recouped their contributions from increased federal funding.

As a part of this scheme Vaughn alleges that the "federal contributions have been diverted away from supporting indigent and uninsured care" and instead have been "used to pay physician/provider salaries and medical-school faculty/staff expenses." He states he learned of the Collaborative's scheme when he was working for HCHD in 2010 as its "Associate Administrator of Provider Practices and Contracting." During his employment, Vaughn attempted to make changes at HCHD to comply with the NBFD statute. However, after Vaughn was unable to achieve any

meaningful changes or oversight, in August 2014 he wrote a letter to the chair of HCHD's Compliance Committee and HCHD's CCO informing them that the medical-school Defendants had been charging for physician and medical-director services in excess of fair market value and that FCA violations had occurred and were continuing to occur. Afterwards, HCHD launched an investigation into Vaughn, and transferred him and his staff to the finance department. Vaughn was ultimately terminated by HCHD.

## Procedural History

Appellant Kent Vaughn filed suit in August 2017 alleging that public hospitals, including HCHD, in concert with private hospitals in Harris County and other medical school Defendants, violated the False Claims Act by claiming and receiving excessive Medicaid funding. In April 2020, Defendants moved to dismiss Vaughn's Second Amended Complaint. The magistrate judge recommended dismissing the claims because of the public disclosure bar and denying Vaughn's request to file a third amended complaint. The district court adopted the magistrate judge's order in full. Vaughn appealed.

## Standard of Review

The court conducts *de novo* review of a district court's order to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019). "To survive a Rule 12(b)(6) motion to dismiss, the complaint 'does not need detailed factual allegations,' but it must provide the plaintiff's grounds for entitlement to relief—including factual allegations that, when assumed to be true, 'raise a right to relief above the speculative level.'" *Taylor v. City of Shreveport*, 798 F.3d 276, 279 (5th Cir. 2015) (citation omitted). "We may affirm a district court's order dismissing a claim under Rule 12(b)(6) 'on any basis supported by the record.'" *Id.* (citation omitted).

No. 22-20659

## Discussion

## I. False Claims Act

The False Claims Act permits individuals who meet certain criteria to pursue damages on behalf of the government for false claims submitted to the government. 31 U.S.C. § 3730(b). Under this provision, the Government may elect to intervene with the action or decline to take over the action. *Id.* § (b)(4). If the Government elects not to proceed, the person who initiated the action may conduct the action. *Id.* § (c)(3). Whether or not the Government elects to proceed with the action, the individual who brought the action may receive a percentage of the proceeds from the action. *Id.* § (d)(1)—(2). The Act provides that:

> (4)(A) [t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,

31 U.S.C. § 3730(e)(4)(A). This section, deemed the "public disclosure bar," seeks to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits" based on publicly available information. *Graham Cnty. Soil & Water Conservation Dist. v. United States*

No. 22-20659

*ex rel. Wilson*, 559 U.S. 280, 295 (2010). The public disclosure bar applies "whenever *qui tam* relators bring a suit based on publicly available information." *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 373 (5th Cir. 2017) (quoting *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011)). The Act provides an exception to the public disclosure bar for individuals who are the "original source of the information." 31 U.S.C. § 3730(e)(4)(A). "Together, the public disclosure bar and its original source exception calibrate the incentives for individuals to bring *qui tam* suits under the False Claims Act." *Colquitt*, 858 F.3d at 373. "The purpose of the [] bar is both to promote private citizen involvement in fraud exposure while also 'preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud.'" *United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 143 (5th Cir. 2017) (quoting *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004)).

The court applies "a three-part test to determine whether this bar applies. It asks '1) whether there has been a 'public disclosure' of allegations or transactions, 2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and 3) if so, whether the relator is the 'original source' of the information.'" *Colquitt*, 858 F.3d at 373 (quoting *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995)). Under the test the court compares "the allegations contained in [the] original complaint with public disclosures available at the time the complaint was filed. If the complaint could have been synthesized from the disclosures, then we determine if the complainant was the original source of the disclosures." *Solomon*, 878 F.3d at 143 (internal citations omitted). The parties do not dispute whether there has been a public disclosure, only whether Vaughn's complaint is based on those publicly disclosed allegations. So we begin our inquiry at step two.

No. 22-20659

## A. Public Disclosure Bar

Vaughn argues that the public disclosure bar does not apply because the publicly available information did not (1) identify these specific Defendants; (2) address above-market payments and "other frauds"; or (3) show Defendants acted knowingly. The district court properly determined that Vaughn's complaint was barred by the public disclosure bar because his complaint was substantially the same as allegations publicly disclosed.

A Plaintiff's FCA complaint is "based upon public disclosures if 'one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the joint venture scheme[.]'" *Solomon*, 878 F.3d at 144. Thus, if the public disclosure was "sufficient to set the government on the trail of the fraud" then there will be "sufficient indicia of an FCA violation to bar a subsequently filed FCA complaint." *Id.* The Fifth Circuit has adopted a test embraced by other circuits to determine if a public disclosure is "sufficient to set the government on the trail of fraud."

> Under this approach, 'the combination of X and Y must be revealed, from which the readers or listeners may infer Z.' Z is an inference of fraud under the FCA, while X and Y are two required elements for the inference: 'a misrepresented state of facts and a true state of facts.' 'The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud.

*Id.* (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654—55 (D.C. Cir. 1994)). Notably, "[w]hen the elements of a fraudulent transaction are present in public disclosures, those public disclosures need not allege fraud in explicit language." *Id.* at 145. The

information publicly available prior to Vaughn's FCA complaint was sufficient to set the government on the trail of fraud. A disclosure by the news media in 2007 provided that "Federal officials are questioning the financial arrangements that allowed the private hospitals to claim the supplemental funds for the first time . . . . [and whether these arrangements represented] an impermissible quid pro quo between a private hospital and public entity." Robert Garrett & Sherry Jacobson, *Texas Hospitals Face End of Funding Plan Federal Officials Halt Payments Medicaid Officials Halt Payments that Ease Indigent-care Burden*, Dallas Morning News (Oct. 6, 2007). Furthermore, contrary to Vaughn's assertion, the same source identified that "private hospitals in 25 communities throughout the state, including Dallas, Houston, San Antonio, Austin[,] and El Paso, were able to generate $264 million in local matching funds . . . to get the federal dollars." *Id.* Another source, in 2008, identified the scheme that Vaughn claims in his complaint:

> [t]hese public-private agreements work like this: a taxing entity sets aside money – in some cases, 8 percent of its tax levy, normally used for the indigent program – to be used as a match for additional Medicaid funds. With that match, the hospitals qualify to receive a higher reimbursement rate for treating Medicaid patients – roughly equivalent to what they receive for treating Medicare patients. That's known as receiving the Medicaid 'upper payment limit.' In return, the hospitals, often through a nonprofit organization, take over paying bills for the county's indigent residents.

Melissa Mcever, *Indigent Program Drawing Scrutiny: Area Officials: Partnership Helping Needy*, Valley Morning Star (July 14, 2008).

No. 22-20659

Another media story in 2015 shows that the federal government was already on the trail of fraud: "federal officials questioned whether Texas hospital districts violate federal law by using money from private hospitals to gain federal matching funds for Medicaid and other needy patients." Mary Ann Roser, *State's Medicaid Overhaul Draws Federal Scrutiny*, Austin American-Statesman (Mar. 29, 2015). These examples are sufficient to show that the federal government was aware of the fraudulent scheme. Contrary to Vaughn's assertion, the way in which the Defendants perpetrated the fraud (above market payments and non-indigent care) need not be alleged. *See Solomon*, 878 F.3d at 145 ("[t]he public disclosures need not expressly allege fraud. The question is whether the relator *could have* synthesized an inference of fraud from the public disclosures."). Accordingly, these public disclosures, and many others not described in detail here, allege facts that make a potentially fraudulent scheme readily identifiable. *See id.* at 146. Thus, the public disclosure bar applies, and Vaughn's complaint may only proceed if he qualifies as an original source.

### B. Original Source

An "original source means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (ii) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). Vaughn's claims were not brought prior to the public disclosures and so only provision (ii) is

relevant here.[1] While the Fifth Circuit has not opined on when an original source qualifies as having "materially added" to a public disclosure, decisions from other circuits prove instructive. In *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016), the court observed that "an addition is material if it is '[o]f such a nature that knowledge of the item would affect a person's decision-making,' or if it is 'significant,' or if it is 'essential.'" *Id.* (citing Black's Law Dictionary, 1124 (10th ed. 2014)). "Our task is to ascertain whether the relators' allegedly new information is sufficiently significant or essential so as to fall into the narrow category of information that materially adds to what has already been revealed through public disclosures. As the level of detail in public disclosures increases, the universe of potentially material additions shrinks." *Id.* Similar to the public disclosure argument, Vaughn alleges that he qualifies as an original source because he (1) identified the specific Defendants; (2) alleged facts to establish Defendants' scienter; and (3) alleged non-public facts showing a more expansive fraudulent scheme. None of the purportedly non-public information alleged by Vaughn "materially adds" to the publicly disclosed allegations. The district court was thus correct in finding that Vaughn does not qualify as an original source.

First, the publicly available information identified Houston and Harris County as having been involved in these collaborative programs. Vaughn could not have materially added information on the identities of the specific Defendants when it was already known at least as early as 2004.

Second, Vaughn's assertion that his allegations of scienter materially add to the public disclosures lacks force. Vaughn alleges that the state and

---

[1] Whether Vaughn voluntarily provided this information to the Government is not disputed.

local governments did not cost-share with the federal government as the Medicaid program required, but shifted the financial burden to private hospitals who later recouped their contributions from increased federal funding. It defies logic to assume that Defendants were unaware that this arrangement was a potential violation of the law, when information and allegations about collaborative schemes such as and including this one were reported by the news media since at least 2004—2017. The court in *Winkelman* has likewise applied this logic:

> the allegations gleaned from [the relator's] experience add nothing significant about CVS's knowledge: every indication from the public disclosures was that CVS was fully aware that it was refusing to provide its [Health Savings Pass] prices to the Connecticut Medicaid program prior to the legislative change—and, indeed, adopted this firm position in spite of known doubts about whether this conduct was legal.

*Winkelman,* 827 F.3d at 213. Accordingly, adding details as to the Defendants' scienter cannot be said to be a material addition.

Vaughn's argument that he alleges a more expansive fraudulent scheme due to Defendants' use of above market payments and non-indigent care likewise fails. The crux of the public disclosures unearths the possible fraud in enumerating a quid pro quo, or program where private hospitals provide services, money, and/or care in order to receive greater government funding. Vaughn's specific theory on the Collaborative's use of above market payments adds nothing significant to the public disclosures. Another source had publicly disclosed that "the controversy stems from a complex payment

system that served as a workaround for the non-public hospitals to put up their own matching funds . . . which the federal government initially intended to come from a local government source." Matt Goodman, *Breaking Down Why CMS Wants $27 Million Back from Dallas Area Hospitals*, D CEO Healthcare (Sept. 8, 2016). Here, "above market payments and non-indigent care" qualify as the complex payment system that serves as a workaround for local government sources to avoid cost-sharing with the government. In a case such as this one, it is not unexpected for a fraudulent scheme to involve some sort of payment manipulation. Vaughn's "addition" therefore cannot be material. Importantly, "offering specific examples of [] conduct does not provide any significant new information where the underlying conduct already has been publicly disclosed." *Winkelman*, 827 F.3d at 212. Accordingly, Vaughn has not made any material additions to the public disclosure, and he thus fails to qualify as an original source. We move to Vaughn's final argument on appeal, that the district court erred in denying him leave to file a third amended complaint.

## II. Leave to Amend

The district court denied Vaughn's Motion for Leave to Amend holding that it would be futile, burdensome, and cause undue delay. Denial of leave to amend is reviewed for abuse of discretion. *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 367 (5th Cir. 2014). The district court did not abuse its discretion in denying the motion. "The district court properly exercises its discretion under Rule 15(a)(2) when it denies leave to amend for a substantial reason, such as undue delay, repeated failures to cure deficiencies, undue prejudice, or futility." *Id.* (citation omitted). Vaughn's purported amendment would add additional facts about scienter, above-market payments and non-indigent coverage. But those facts do not materially add to what has already been publicly disclosed. Any such

No. 22-20659

amendments are futile. The district court therefore could have denied the motion on that ground alone; however, the district court also found that Vaughn had essentially rewritten his complaint and based it on a new legal theory after four years of litigation. So undue delay is another reason in support of denial of the motion.

## Conclusion

For all of the foregoing reasons, the judgment of the district court is AFFIRMED.